COUNCIL OF ORGANIZATIONS ON PHILADELPHIA POLICE ACCOUNT-ABILITY AND RESPONSIBILITY et al., Plaintiffs,

v.

Frank L. RIZZO et al., Defendants.

Gerald G. GOODE et al., Plaintiffs,

v.

James H. J. TATE, Mayor, City of Philadelphia, Pennsylvania, et al., Defendants.

Civ. A. Nos. 70-2430, 70-491.

United States District Court,
E. D. Pennsylvania.

March 14, 1973.

Pepper, Hamilton & Scheetz by Peter Hearn, and F. John Hagele, III, Philadelphia, Pa., for plaintiffs Goode, and others.

George J. Ivins, Deputy City Sol., John Mattioni, Asst. City Sol., for defendants Tate, and others.

William Lee Akers, Harry Lore, and Richard Axelrod, Philadelphia, Pa., for plaintiffs Council of Organizations on Philadelphia Police Accountability and Responsibility, and others.

George J. Ivins, and John B. Day, Philadelphia, Pa., for defendants Tate, and others (except Arlen Specter).

David Richman, Philadelphia, Pa., for Arlen Specter.

## OPINION AND ORDER

FULLAM, District Judge.

In two separate but related civil rights actions, certain individuals and groups, acting on behalf of minority citizens and residents of Philadelphia, seek various forms of relief against the Mayor and police officials of the City, on the basis of alleged widespread violations of the constitutional rights of minority citizens by the police of the City of Philadelphia.

From a procedural standpoint, the record in these cases is somewhat anomalous: plaintiffs and their respective counsel are different in the two cases, and have proceeded independently. However, both groups of plaintiffs purport to act on behalf of essentially the same class of plaintiffs. Although the specific relief sought in each case is different, both sets of plaintiffs urge that a pattern of unconstitutional behavior on the part of the police is shown by their evidence of numerous specific instances of such alleged misconduct; each group relies upon a different set of specific instances as examples alleged to establish the pattern. Since I have heard all of the evidence in both cases, it would be difficult, and in my opinion improper, in view of the nature of the claims, to dispose of each case separately, based upon its own limited record. The defendants in both cases are essentially the same, and are represented by the same counsel in both cases.

This Court's disposition of these cases has already been delayed too long. Much of this delay is squarely the responsibility of the Court, and is attributable to other pressing demands of its case load. In partial justification for this unfortunate delay, it may be noted that the records of the two cases are extremely complex, the issues involved are subtle and somewhat novel, and the required decisions touch upon sensitive and emotion-filled aspects of community life.

Another factor requires mention. During the pendency of these two actions before the undersigned, a third case filed by different plaintiffs on behalf of the same class of plaintiffs, seeking similar relief, was pending before another member of this Court. That case, which was instituted after the *Goode* case but before the *COPPAR* case, eventuated in a consent decree granting injunctive relief, dated December 18, 1972. The defendants in all three cases are essentially the same, and all have been represented throughout by the City Solicitor's office. Nevertheless, at no time have defense counsel meaningfully addressed themselves to the class action issues involved, nor to questions of *res judicata* or collateral estoppel which may be involved.

A brief summary of the issues in all three cases will provide a starting point for analysis: In the *Goode* case, Civil Action No. 70–491, plaintiffs contend that certain police officers of the City of Philadelphia are biased against Negroes and other minority groups, and habitually violate their legal and constitutional rights in the course of carrying out their police duties; that the proclivities of these officers are well known to their superiors in the Department; that the persons in control of the supervision of the Police Department, by failing to take appropriate disciplinary action, have condoned these illegal and unconstitutional activities, as a matter of policy. Plaintiffs further contend that there is no adequate machinery for dealing with civilian complaints against the police,

and that departmental resistance to the creation or implementation of adequate complaint procedures justifies the conclusion that it is the policy of the Department to condone racially discriminatory actions by the police. Plaintiffs seek two kinds of relief in this action: removal or other appropriate disciplinary action in the cases of certain named policemen; and establishment of appropriate machinery to deal with civilian complaints against police.

The COPPAR plaintiffs (Civil Action No. 70–2430) allege widespread and systematic violations of the constitutional rights of Negroes and other citizens by the police in the routine performance of their duties, with the express or tacit approval of their superiors. Plaintiffs ask the Court to appoint a "receiver" or similar official to supervise the Police Department (presumably, sweeping injunctive relief, and the appointment of a master to supervise enforcement of the decree), to prevent further violations. This case was originally precipitated by certain incidents involving police raids on buildings thought to be occupied by members of the "Black Panther" Party, threatened interference with a proposed convention of that group of the City, and the alleged holding of certain black militants without probable cause and in excessive bail. At an earlier stage, this Court entered a temporary restraining order which alleviated some of the immediate problems; eventually, this order expired by its own terms, and has not been renewed.

The plaintiffs in *Goode* presented evidence of ten specific instances of alleged violations, together with a mass of evidence, including expert testimony, dealing with the alleged inadequacies of existing complaint procedures; the defendants produced some countervailing evidence on both subjects. The *COPPAR* plaintiffs produced evidence relating to some 30 additional specific instances of alleged misconduct, and a limited amount of evidence challenging the complaint procedures; the defendants presented evidence to the contrary in most, if not all, of the instances alleged.

In the third action, Alexander et al. v. Rizzo et al., Civil Action No. 70–992, the principal charge of discrimination against blacks alleged in the complaint was the practice of widespread arrests "for investigation," and incidental indignities related thereto, apparently triggered by a particular incident involving the murder of a Philadelphia police officer. The injunctive decree in that case, which was entered "without hearing or trial and upon the stipulation of the parties", embodies detailed provisions governing police contacts with civilians based upon less than probable cause for arrest.

The Court's findings of fact are set forth below. They reflect evaluations of credibility which give appropriate weight, on the one hand, to the anti-police bias of many of the complaining witnesses, and their emotional involvement in the incidents, and, on the other hand, to the natural reluctance of the accused officers to concede any misconduct on their part. Whenever the merits were substantially in doubt, the defendants were accorded the full benefit of the presumption that the police officers acted properly.

## I. FINDINGS OF FACT

### A. *General*

During the period covered by the evidence produced at the hearings in these cases, James H. J. Tate was Mayor of Philadelphia, and Frank L. Rizzo was Police Commissioner. Mr. Rizzo is now the Mayor.

During the same period, Fred T. Corleto, was Managing Director of the City of Philadelphia; Hillel S. Levinson is now the Managing Director. Under § 5–100 of the Philadelphia Home Rule Charter, the Managing Director is charged with responsibility for supervising all activities of those departments the heads of which are appointed by him. Under § 3–206 of the Charter, the Managing Director, with the approval of the Mayor, appoints the Police Commissioner.

The Police Commissioner, under Charter § 3–404, serves at the pleasure of the Managing Director. He has responsibility for supervision and control over activities of the Police Department. Charter § 5–200(b) provides that the Police Department "shall discipline the Philadelphia police."

Defendant Robert G. Selfridge is Deputy Police Commissioner in charge of the uniformed forces of the Police Department. Defendant William Murphy is Chief of the Highway Patrol and exercises supervision and control over its members. The chain of command within the Highway Patrol is: captain, lieutenant, sergeant, and patrolman.

During the period covered by the evidence, Anthony DeFazio was a police officer of the City of Philadelphia, having been appointed on December 28, 1965. He served as a member of the Highway Patrol. Shortly before the conclusion of the hearings in these cases, he was retired on disability, and is no longer an active policeman.

John D'Amico is a Philadelphia police officer, a member of the Highway Patrol, having been appointed to the Department on June 26, 1967.

### B. *Existing Complaint Procedures*

As a general practice, no record is made by the Police Department of any civilian complaints, unless submitted in writing. There are no forms available to citizens for filing such complaints. When a written complaint is filed, it is supposed to be recorded by the police on a "complaint and incident report" form (No. 75–48); but the general practice at the district level is not to record such complaints.

When a complaint has been recorded, an investigation is made by Police Department inspectors assigned to Staff Inspection Headquarters. The investigation includes obtaining a statement of the complainant and the officers involved. The Police Department controls the investigation and does not assist the complainant in obtaining witnesses.

The tendency is to minimize, and seek avoidance or withdrawal of complaints.

Police officers accused of misconduct do not submit to interviews or give statements relating to the charges to anyone other than the police investigators.

Police officers accused of misconduct never submit to polygraph tests. While there is no departmental regulation on the subject, the Fraternal Order of Police has a fixed policy of refusing to lend its support or provide counsel for any police officer who submits to a polygraph test, and this policy is well-known to the Police Department. In consequence, as above stated, police do not submit to such examination. Nevertheless, complainants against police officers are frequently requested to, and do, submit to polygraph examinations, unaware that the accused officer will not be so examined. No records are kept of the manner in which the polygraph test is administered; only a result is noted.

When an officer is under investigation, his personnel file is usually examined. Commendations from the Commissioner and commendatory letters from citizens are always placed in an officer's personnel file. Letters of complaint are not. If an officer has been brought before a police board of inquiry, that fact is noted in his personnel file. If there are several such instances, some further investigation as to the basis for the previous board of inquiry contacts is usually made.

The investigators prepare a report for the Police Commissioner. Previous incidents of alleged misconduct are not mentioned in the report, unless there are several of them and they have been investigated.

The Commissioner decides, in his sole discretion, whether an officer should face trial before the Police Board of Inquiry for a violation of the Police Department Disciplinary Code. It is generally believed within the Department that the Commissioner refers cases to a board of inquiry for trial only if he is already convinced that the accused officer is guilty and should be disciplined.

A board of inquiry consists of three police officers. The complaint is presented by a police "advocate" at a trial-type hearing. Upon a finding of guilty, penalties (reprimand, suspension or dismissal) are recommended to the Commissioner. The final decision with respect to imposition of penalties rests with the Commissioner. Dismissals are reviewable by the Philadelphia Civil Service Commission.

Counsel for the complainant (other than the "police advocate") is not permitted to participate in the hearing before the Board of Inquiry. Accused police officers are represented by counsel.

The entire departmental disciplinary procedure is directed primarily to violation of departmental rules and regulations, rather than to alleged violations of legal or constitutional rights of civilians.

For the most part, a civilian complainant against a police officer is not informed of the final disposition of his complaint.

C. *Commission on Human Relations*

The Philadelphia Commission on Human Relations is an independent commission established by § 3–100(e) of the Philadelphia Home Rule Charter. Its powers and duties are to ". . . enforce all statutes and ordinances prohibiting discrimination against persons because of race, color, religion or national origin . . ." and to ". . . conduct educational programs to promote the equal rights and opportunities of all persons regardless of their race, color, religion or national origin" (Charter § 4–700).

The Commission receives complaints from citizens alleging misconduct by the Philadelphia Police, but the Commission has no investigatory or enforcement powers with respect to such complaints.

Until mid-1969, the Commission would forward such complaints to the Police Department, the Department would in-

vestigate and report the results of its investigation to the Commission; and the Commission would advise the complainant of these results. Beginning in mid-1969, the Police Department terminated its practice of providing the Commission with a report of the investigation; instead, a summary was provided. The Commission thereupon terminated its practice of handling citizen complaints against police. Instead, it directs complainants to other agencies, such as Philadelphians for Equal Justice, Community Legal Services, the American Civil Liberties Union, or the District Attorney's office.

### D. *Police Advisory Board of Philadelphia*

The Police Advisory Board of Philadelphia was an agency established in 1958 by the then Mayor of Philadelphia, to hear complaints by citizens against Philadelphia police involving alleged violations of constitutional rights or other mistreatment. The Board then made recommendation to the Mayor in each case.

In March of 1967, the Court of Common Pleas of Philadelphia enjoined the Board from further functioning, and the Board became inactive. The Supreme Court of Pennsylvania reversed the lower court decision in June of 1969. On December 22, 1969, the Board was dissolved by Mayor Tate. During the period of its operations, the Board had no investigative resources, and relied primarily on the investigations made by the Police Department. Because of uncertainty as to whether the Board had subpoena power, it never attempted to exercise such power.

### E. *Criminal Prosecution of Police Through District Attorney's Office*

The District Attorney is responsible for the prosecution of all persons charged with crimes, as defined by local and state law, within the City of Philadelphia. The Community Rights Division of the District Attorney's office is responsible for prosecuting police officers charged with having committed crimes against citizens.

Complaints received by the District Attorney's office are sent to the Police Department for investigation. A report is returned to the District Attorney, who then decides whether or not to prosecute.

In many cases where a complaint is made against a police officer, criminal charges arising out of the same incident are pending against the complainant. The District Attorney also has responsibility for prosecuting the complainant. In many cases, the same Assistant District Attorney may be responsible for some aspects of both prosecutions.

Prosecutions of police officers do not occur unless serious physical injury has been sustained by a citizen as a result of police action. Often, complaints against police are dropped in exchange for a dismissal of criminal charges against the complainant.

The District Attorney's office does not ordinarily communicate to the claimants its decision not to prosecute the police officer.

### F. *Goode Case*

The plaintiffs in this case are black citizens of Philadelphia who claim that their constitutional rights have been infringed by the conduct of Philadelphia police; they bring their action on behalf of themselves and all other citizens of Philadelphia whose constitutional rights have been or are likely to be thus infringed.

I make the following findings of fact concerning the specific instances alleged:

1. *Roy Lee Shaw.* On March 10, 1969, Roy Lee Shaw, a 16-year old black male, was arrested and charged with assault and battery on a police officer, resisting arrest and disorderly conduct.

On that date, at about 2 p. m., Shaw walked out of a store located at the corner of 11th and Somerset Streets. Officer DeFazio of the Highway Patrol, who was patroling the area in an unmarked

car, observed Shaw. He drove around the block, proceeded south on 11th Street (a one-way streeet for northbound traffic), parked his car adjacent to where Shaw was walking, got out of his car and told Shaw to stop. Shaw turned and asked why he was being stopped, whereupon DeFazio struck him on the head with a blackjack. Shaw then struck DeFazio on the chin, and ran north on 11th Street. DeFazio drew his service revolver and fired a shot in the general direction in which Shaw was running. Shaw then stopped, DeFazio placed one handcuff on him, and pulled him, struggling, back to the police car. DeFazio shoved Shaw into the car and called for additional police help. Shaw was lying face down on the back seat of the police car, still struggling, and DeFazio then struck him with his nightstick. Two other officers arrived on the scene, and additional blows were struck, until they succeeded in placing both handcuffs on Shaw and placing him in a police wagon.

A crowd, mostly blacks, was attracted to the scene by the commotion. As the officers left, DeFazio made various racially derogatory remarks to the crowd.

Shaw was transported to the headquarters of the 25th Police District, where he was again struck by police nightsticks. His mother attempted to visit him, but was not permitted to see him while he was at the district office.

Eventually, Shaw was transported to Episcopal Hospital and received medical treatment. A cut on his head required four stitches. After receiving medical treatment, Shaw was taken back to the 25th Police District and held for approximately two more hours, whereupon he was released in the custody of his mother.

On June 11, 1969, Shaw was initially adjudicated delinquent in Juvenile Court proceedings, but was released without probation. The next day, the disposition of the case was changed to "discharge as to offense."

There was no basis for stopping Shaw in the first place, there was no probable cause to arrest him, and his arrest was illegal. He did not assault DeFazio, nor was he guilty of disorderly conduct; he merely made minimal efforts to defend himself and to protest the violation of his rights.

Neither Shaw nor any member of his family made any complaint to the Police Department or any other City official concerning this matter. Shaw did bring the matter to the attention of Community Legal Services; a staff attorney of that organization wrote to the Community Relations Service of the United States Department of Justice describing the incident, but received no reply.

2. *Gerald G. Goode.* On December 1, 1969, at about 11 o'clock p. m. or midnight, Gerald G. Goode, a 25-year old black graduate student at the University of Pennsylvania, six feet one inch tall and weighing approximately 200 pounds, was a passenger in an automobile driven by Mrs. Ruth Rotko, a white woman, the wife of an Assistant District Attorney of Philadelphia. They were proceeding north on Broad Street. Mr. Goode was sitting in the right rear seat and was the only passenger.

Near the intersection of Broad Street and Erie Avenue, while their car was stopped for a traffic light, Mr. Goode noticed police officers DeFazio and D'Amico frisking a black man nearby. Mr. Goode rolled down the car window and called to the officers that they had no right to do what they were doing, and that they should leave the man alone. At that time, the officers were approximately 25 feet away from the car, and within hearing range of Mr. Goode's remarks. Mr. Goode did not use profanity or make any personally derogatory remarks.

The traffic light then turned green, and the Rotko car proceeded north for several blocks, until overtaken and stopped by D'Amico and DeFazio, who gave chase in an unmarked police car. Both officers proceeded to the passenger side of the Rotko car, and one of them

called to Mrs. Rotko to produce her identification cards. DeFazio ordered Goode to get out of the car. When Goode did not promptly comply, DeFazio opened the unlocked front door of the car, reached through and unlocked the rear door, and opened it. He struck Goode on the knee with a blackjack and yanked him out of the car by his coat. The officers then turned Goode around against the car and patted him down.

Goode demanded to know why he was being subjected to this treatment, but received no reply. The officers attempted to place handcuffs on him, and he swung his arms in an attempt to avoid the handcuffs.

As Goode was being pulled from the car and turned around, he stepped on the foot or bumped the leg of Officer D'Amico.

After being frisked, Goode turned and again asked for an explanation for the police action, whereupon Officer DeFazio struck him across the cheek and mouth with a blackjack, cutting his lip. Angered by this treatment, Goode told the officers to "get your fucking hands off me".

After handcuffing Mr. Goode and placing him in the police car, the officers returned to the Rotko car and asked Mrs. Rotko for her driver's license and registration card. Officer D'Amico searched the back seat and rear interior portion of the car. Both officers inquired of Mrs. Rotko as to the basis of her acquaintanceship with Mr. Goode. Mrs. Rotko was given a ticket for failing to have her driver's license in her possession, and there was some suggestion that they might arrest her too.

In explanation of their arrest of Mr. Goode, Officer D'Amico stated "you can't use profanity with an officer."

Mr. Goode was taken to a police station and detained in a cell for approximately two hours. He was then taken to Episcopal Hospital, where he received several stitches in his lip and a tetanus shot. He was then returned to the police station and, at approximately 5 a. m., was taken to the Police Administration Building at 8th and Race Streets, where he was fingerprinted and photographed. At approximately 9 a. m. the next day he was brought before a magistrate on charges of assault and battery on an officer, resisting arrest, and breach of the peace, and was released on nominal bail. On February 11, 1970, all charges against Mr. Goode were dismissed, upon the joint motion of the Commonwealth and Mr. Goode's attorney.

The Police Department conducted an investigation into the conduct of D'Amico and DeFazio in this matter; the investigation was under the supervision of staff inspectors Ditmer and Fragassi.

Statements were taken from the persons directly involved and from five witnesses, and a report summarizing the statements was compiled. The personnel records of the officers were checked. DeFazio's personnel record at that time showed one previous suspension and two appearances before the Police Board of Inquiry. No further check into the backgrounds of the officers was made, nor was DeFazio's prior record referred to in the report.

The statements obtained by the investigating inspectors were essentially in accord with the facts set forth above. The statements of Officers D'Amico and DeFazio (neither of whom testified in the present case) asserted that Goode had used profanity in his initial comments to them and that he was unruly and boisterous after they stopped his car.

The inspectors expressed the conclusion that Mr. Goode's initial comments to the officers constituted probable cause for his arrest; that only reasonable force was used; that the officers were not unduly rude to Mrs. Rotko; and that, in summary, there was no basis for disciplinary action against either officer.

In finding that there was probable cause for the arrest of Mr. Goode, the inspectors adopted the interesting rea-

soning that Mr. Goode's initial comments must have created probable cause for his arrest, otherwise the officers would not have pursued the Rotko car so vigorously.

On the basis of the undisputed and admitted facts, it is entirely clear that there was no probable cause for arresting Mr. Goode, and that the conduct of the police was in flagrant violation of the law and the Constitution.

3. *The Ballow Incident.* On June 20, 1970, at approximately 7:45 p. m., Officers Frederick Moorse and John D'Amico observed a black male operating a motorcycle which did not have registration plates. The man refused to stop at their request, whereupon they gave chase in their police car. Eventually, the man fell off the motorcycle, and escaped on foot, the officers in pursuit.

The officers concluded that the person sought had entered a house at 2337 N Howard Street. As the officers arrived at that address, a crowd of approximately 20 people, mostly black, gathered in the street.

Juanita Ballow and one Carlos Edney resided at that address. Plaintiffs' testimony was to the effect that Officer D'Amico ran into the house, passed Miss Ballow, went up to the second floor, came back downstairs and then told Miss Ballow that he was chasing someone. The defense version was that the two officers stopped at the door of the house, where they were confronted by Miss Ballow and Mr. Edney. For present purposes, this discrepancy need not be resolved.

It appears to be undisputed that, when Miss Ballow and Mr. Edney demanded to know what the police wanted, Officer D'Amico drew his service revolver and threatened to shoot Miss Ballow. Officer Moorse summoned assistance, and an additional police officer arrived. D'Amico broke the glass in the front door of the house with his nightstick, and the three officers entered the house. Mr. Edney was standing inside in the hallway, with a wrench in his hand.

After a brief discussion with Officer D'Amico as to the officers' purpose, a scuffle ensued. When D'Amico again threatened to use his revolver, Edney escaped out the back door.

The officers searched the upper floors of the house, but did not find the man they were originally looking for. The officers emerged from the front of the house, and Carlos Edney, who had come around from the back of the house, again asked what they were doing, and made a derogatory remark to D'Amico. D'Amico pushed Edney against a parked car and handcuffed him.

As Carlos Edney was being handcuffed, his brother, Frederick Edney, arrived on the scene, ran up to D'Amico and asked him what Carlos was being arrested for. Allegedly because Frederick seemed to be reaching into his pocket as if to draw something from it, the officers physically restrained him and handcuffed him as well. Frederick Edney had no weapon or anything else in his pocket. Both of the Edneys were taken into custody. On July 31, 1970, Frederick Edney was convicted in Municipal Court on a charge of interfering with a police officer.

4. *Herbert Brown Incident.* On December 1, 1969, at about 12:30 a. m., Herbert Brown and Wesley Joiner, two black men, were walking along Atlantic Street near its intersection with Old York Road. There were automobiles parked along Atlantic Street near where they were walking, and they were carrying a flashlight.

Officers DeFazio and D'Amico, who were patrolling the area in an unmarked car, stopped the two men and pushed them up against a wall. Brown and Joiner were discovered to be carrying a pair of pliers and a screwdriver, as well as a flashlight. DeFazio stated to Brown, "Got you now, nigger," and accused him of attempting to steal a car battery. When Brown attempted to explain that his own disabled vehicle was parked about a block away, with two girlfriends in it; and that he was look-

ing for a piece of wire with which to attempt to start his car, DeFazio struck him in the face with his hand.

The two men were handcuffed, placed in the police car, and taken to the police station. Their request for permission to inform their waiting female companions, and to give them carfare so that they could get home, was denied. When Brown complained that his handcuffs were too tight, DeFazio again used racially derogatory terms and did not loosen the handcuffs until they arrived at the police station. Charges of attempted larceny against Brown and Joiner were ultimately dismissed, for lack of a prosecuting witness.

Giving the police the benefit of the doubt, I shall assume for present purposes that the two men were, or reasonably appeared to be, attempting to steal a battery. But this would not, of course, justify the racial slurs, the rough treatment, or the disregard of the plight of their stranded female companions.

5. *Bernard Sisco Incident*. On October 31, 1969, at about 9:30 p. m., police patroling in the 16th District were notified by radio that a rape had occurred in the area of 37th and Wallace Streets. Shortly thereafter, approximately six officers arrived at the scene. The complaining witness stated that she had been raped by several males, and that she knew that one of them was blind and lived at 3620 Wallace Street, a short distance away.

Bernard Sisco, a blind 20-year old black male, resided at the address stated. Officers DeFazio, Carroll and Brown proceeded to that address, and, without standing on ceremony, opened the door and entered the house, announcing simultaneously that they were police officers. Bernard Sisco opened the vestibule door from the inside and stood there, with an open knife in his hand. The police officers heard the victim of the rape, who had accompanied them, say something to the effect that Sisco was one of the rapists.

The police ordered Sisco to drop his knife, and he did so, whereupon the police wrestled him to the floor. Lieutenant Taylor and Lieutenant McGaughrin came up onto the porch to help subdue Sisco. After a struggle, the officers succeeded in handcuffing Sisco, and pulled him out of his house and into the street. While they were awaiting the arrival of a patrol wagon, Sisco spit on Officer Carroll, whereupon Officer Carroll lost control of his temper, grabbed him by the collar, pushed him to the ground, and began beating him. A superior officer ordered Carroll to go back to his police car, and he did so.

When the officers were placing Sisco in the patrol wagon, he stumbled, whereupon Officer DeFazio pushed him violently into the wagon.

Sisco was taken to the West Detective Division Headquarters at 44th and Parkside, where he remained for approximately four hours. He had been at the Detective Division Headquarters for about two hours before his mother was permitted to see him for the first time. She brought him a clean set of clothing, and observed that he was bleeding from his nose and mouth.

Thereafter, Sisco was taken to the Police Administration Building for processing. Photographs, taken some time between 2:25 a. m. and 4:45 a. m., on November 1, 1969, reveal no visible signs of physical injury to his head, nor do they conclusively rule out the presence of injury. The medical records of the Philadelphia Detention Center, where Sisco was held without bail pending preliminary hearing, do not reveal that he received any treatment. He was kept in the prison hospital solely because of his blindness, and not for any other reason.

At a preliminary hearing on November 7, 1969, the rape charges were dismissed when the victim was unable to identify Sisco positively as one of her assailants. He was, however, held for court on charges of resisting arrest, assault and battery on an officer, and carrying a concealed deadly weapon.

After the preliminary hearing, a physician to whom Sisco was referred by his rehabilitation counsellor, examined him on November 11, 1969. The doctor found swelling on the top of the head, and concluded that Sisco had suffered a cerebral concussion.

The evidence upon which the foregoing findings are based is sharply conflicting. According to Sisco, his sister, and his mother, Sisco never offered any resistance to the police, but was nevertheless severely and monstrously abused, both at the scene of the arrest, and while in police custody thereafter. If their testimony were accepted at face value, the police acted with utter barbarity. If the testimony of the police and the victim of the alleged rape were accepted as literally correct, Sisco was never struck at all by any of the police. Under this version, any physical mistreatment of Sisco was self-inflicted, by reason of his rolling around on the ground and otherwise struggling against the handcuffs.

Given the fact that the police believed they were in "hot pursuit," and the admitted circumstances of their entry into the Sisco house and their initial observation of Sisco; and given the admitted fact that at least one officer became so angry that he had to be restrained by his superior officer, I have no doubt that Sisco was struck, and that the officers did not limit their use of force to the precise amount required to "subdue" a prisoner who was, after all, both blind and handcuffed, and who had earlier relinquished his weapon when ordered to do so.

While I have concluded that the testimony of the complaining witnesses is undoubtedly exaggerated, I do not believe it is totally fictional. The exaggerations and embroidery sprang from a sincere and deeply held conviction that the conduct of the officers was totally unjustified.

The evidence was sharply in conflict as to whether the victim of the crime identified Sisco as one of her assailants, before his arrest. I have accepted the defense testimony that she did. It must be conceded, however, that the extent of her opportunity to make such an identification before the initial scuffle is not altogether clear; and 10 days later she was unable to identify him at the preliminary hearing.

6. *Joseph Reas Incident.* On the evening of May 2, 1969, Joseph Reas, a 16-year old white male, was attending a carnival at Father Judge High School. At approximately 10 p. m., he and three other boys entered the school playground near the carnival area, and saw a girl who was weeping and who had blood on her face. Police arrived at the scene and some of the boys started to run away. Reas did not run. However, he was struck twice on the head with a blackjack, fell to the ground, and was struck again on the back of the head. His head was cut open, and he lost consciousness as he was being placed in a police wagon.

Officer DeFazio was one of several officers who arrested Reas and other teenagers on that occasion.

Reas was taken to Nazareth Hospital, where he regained consciousness and received several stitches to close his head wound. He remained in the hospital for two days. He was initially charged with inciting to riot, but the charges were dropped while he was still in the hospital.

The boy's mother could obtain no information from the hospital as to what had occurred. The next day she went to the 7th Police District Headquarters but no one there could give her any information as to the identity of the police officers involved, except that they were members of the Highway Patrol.

In some undisclosed fashion, Mrs. Reas was caused to believe that Officer DeFazio was probably the one who had struck her son. She spoke to Captain Murphy, Commanding Officer of the Highway Patrol, several times by telephone. She was discouraged from attempting to speak directly to Officer

DeFazio, but was advised that she had the right to press charges against him.

Mrs. Reas did not press charges against Officer DeFazio. Several months after the incident, DeFazio visited Mrs. Reas at her place of employment, and, among other things, told her: "Highway patrolmen are known to be rough and tough, and I am a highway patrolman, and I am proud of it."

7. *Disciplinary Action.* In none of the foregoing incidents was any disciplinary action taken against Officer DeFazio, D'Amico, or, so far as the record discloses, any of the other police officers involved. In the following two instances, disciplinary action was taken against DeFazio:

(a) *Louise J. Reed.* On October 3, 1967, Louise J. Reed, a black woman and the wife of a Common Pleas judge, and Coleman Clark, a white man, were employed as teachers at the George Washington Carver Elementary School, which is located in a predominately black area.

Officer DeFazio was patrolling the area in a police car. At about 4 p. m., Mr. Clark, who had just left a faculty meeting at the school, was driving his car nearby. Officer DeFazio stopped him in front of the school; Mr. Clark did not know why he was being stopped, and DeFazio did not tell him. A heated discussion followed.

At about that time, other faculty members were emerging from the school. Among other things, DeFazio told Clark to shut up, and accused him of acting like "the black pigs that live around here." Mrs. Reed remonstrated with DeFazio because of this remark, but was told to shut up. Mr. Clark rejoined the argument, and others became involved. At one point, DeFazio placed Clark under arrest, but the school principal intervened and restored calm.

The next day, 57 members of the faculty of the school complained in writing to DeFazio's commanding officer, with copies to the Mayor and Police Commissioner. Ultimately, on November 8, 1967, DeFazio was tried by the Police Board of Inquiry on charges of using rude and insulting language, and conduct offensive to the public. Mr. Clark and DeFazio exchanged apologies. The Board found DeFazio guilty and recommended a two-day suspension, with which the Police Commissioner concurred. Mr. Clark was informed of the Board's decision.

(b) *Anti-Semitic Remarks.* On the same date as the hearing referred to in the preceding paragraph, DeFazio was also tried by the Police Board of Inquiry on charges of insubordination, neglect of duty and disobedience of orders. He was found guilty of having referred to a member of the public as a "Jew bastard" in the presence of a Jewish police officer; appearing at a court hearing in improper uniform, and refusing to submit a memorandum to a superior officer. The Board of Inquiry recommended a 10-day suspension; Police Commissioner Rizzo reduced this to three days' suspension.

As a result of the two incidents discussed above, DeFazio received a total suspension of five days. However, this was "served" by deducting five days from his accrued vacation time, and thus did not result in any actual pecuniary loss.

8. *Miscellaneous.* There was a great deal of evidence concerning Officer DeFazio's off-duty conduct in his home neighborhood. This evidence, which is substantially uncontradicted, raises further serious questions about DeFazio's fitness for police work. However, since DeFazio is no longer on the force, no useful purpose would be served by detailing the circumstances here.

It is clear that numerous oral complaints were received by DeFazio's superiors, relating to his conduct both on and off duty, and that no written record of these complaints was made, and no action taken. These complaints had no appreciable effect upon DeFazio's official fitness ratings.

## G. COPPAR Case

The Coalition of Organizations on Philadelphia Police Accountability and Responsibility (COPPAR) is an organization of some 32 constituent organizations with a common concern about police conduct and police-citizen relations. The Co-Chairmen of the organization are Mrs. Mary Rouse and Mr. Floyd Platton. The principal function of the organization is to receive citizen complaints of police misconduct through its constituent organizations, and, with the help of attorneys retained through these organizations, to bring the complaint to the attention of the Police Commissioner or other authorities in a position to remedy the conduct in question. Mrs. Rouse maintains an office at 124 W. Cumberland Street, Philadelphia, Pennsylvania.

COPPAR, and the individual plaintiffs (all of who claim to have been the victims of unconstitutional police conduct), purport to bring this action on behalf of themselves and all others in Philadelphia who are, or are likely to be, similarly mistreated. Additional plaintiffs include the Black Panther Party, a militant black organization; and the Young Lords Party, a militant organization of persons with Latin American ancestry.

The specific instances of alleged police misconduct are set forth in chronological order, in the following findings:

1. *Charles Blackman.* This incident evolved from an altercation between Charles Blackman, a black male who resides at 1412 S. Fallon Street, and Officer Crawford McGerald, a black police officer who was off duty at the time.

Mr. Blackman's house is apparently quite close to the street. In parking his car in front of the Blackman residence, McGerald apparently permitted the vehicle to come in contact with the house; at least, Mr. Blackman was convinced that he had done so. Blackman called the police to report the incident, but the investigating officer, finding that Mc-Gerald was then parked legally, and obse_ _ng no damage, left the area.

Shortly thereafter, Blackman encountered McGerald and cursed at him because of the incident. McGerald pushed Blackman down in the street. Blackman struck McGerald a glancing blow on the side of his body with an ice pick which Blackman was carrying. Thereupon McGerald pursued Blackman onto the porch of his house, drew his revolver and struck Blackman on the side of the face with it.

A patrol wagon, and the investigating officer referred to above, arrived at the scene. They accepted McGerald's version of the incident, took Blackman to a hospital and, after he refused treatment, to the West Detective Division, where he was placed under arrest and charged with aggravated assault and battery on a police officer.

This incident is of no significance in the present case. At most, it arguably demonstrates that, in a case of a personal altercation between a civilian and an off-duty policeman, the police are likely to side with their colleague.

2. *Robert Nicholas.* Two Community Legal Services lawyers, engaged by a local community organization to represent two young men who had been arrested, were initially refused permission to see or talk to their clients. A high-ranking police officer, Inspector Shields, was called to the station. He reiterated the view that it was the policy of the Police Department not to permit attorneys to talk to defendants unless they knew the names of their clients and had been retained by the clients' families, as distinguished from community organizations. The police made no attempt to verify the parents' wishes in the matter, although one or more of them was present in the vicinity. The police appeared to be suspicious of the attorneys and antagonistic to the community organization which had engaged their services.

The defendants contend that the alleged police policy explained by Inspec-

tor Shields has since been discarded. I accept that representation.

3. *Raymond Ragland.* On May 18, 1970, at about 11 p. m., Raymond Ragland, a black male pharmacologist, was walking slowly on the sidewalk along Gowen Avenue near his home. This is a racially mixed area. Ragland was neatly dressed. An unmarked police car, which had been proceeding in the opposite direction, turned around a short distance up the street and came back towards Mr. Ragland. He looked at the car after it had completed this maneuver.

Officers Rowe and Taylor, who were in the police car, stopped and asked Ragland if he was all right. They received no audible response. They then got out of the police car and asked for identification. Ragland told them that he had none, although he did have a wallet on his person. Ragland complained to the police about being stopped and asked for identification.

Thereafter, over the space of about 10 minutes, a spirited discussion ensued, during which the officers continued to demand identification, and asked Ragland to take his right hand out of his pocket. Ragland continued to question their reason for stopping him, and told them that if he was wanted for anything they should take him to a police station, otherwise they should let him go.

Finally, Officer Taylor reached for Ragland's right hand, and Ragland quickly pulled his hand out of his pocket. The officers then told Ragland he was under arrest, but did not say what for.

Ragland was then frisked. The officers pulled his arms behind his back for the purpose of handcuffing him. Ragland pulled his left arm away. One officer thereupon told him that he would "twist your black arm off." Officer Taylor struck Ragland on the arms, spine and knuckles with his nightstick, and also jabbed him in the stomach with the stick. Ragland was handcuffed, and taken in a patrol wagon to the 14th District Station, where he produced his identification. He was told that he was being held "for investigation."

Thereafter, Ragland was taken to Northwest Detective Headquarters, about three miles away. He was asked his name, address and occupation, and asked what organizations he belonged to. He was also requested to make a statement. Ragland identified himself, but refused to make any further statement. He was then told by a detective that he was being charged with assault and battery on an officer, resisting arrest, and disturbing the peace. About an hour later, Ragland was transported to the Police Administration Building. He was given a preliminary hearing, and was released on his own recognizance at about 5 a. m. Several weeks later the charges were dismissed at a further hearing.

Ragland wrote a letter of complaint to the Police Commissioner. The latter responded, advising that the complaint was being referred to the Highway Patrol. Several weeks later, a representative of the Highway Patrol informed some of Ragland's fellow employees that nothing would be done with respect to the complaint. Ragland also gave a statement to the FBI concerning the incident, but never heard further from that agency.

Several months later, a staff inspector of the Police Department requested Ragland to provide a written statement of the incident, and Ragland complied. Three months later, having heard nothing further about the matter, Ragland's attorney telephoned Inspector Kopsitz, and was then advised that no action would be taken. Except for this conversation, Ragland has never received any information from the Police Department concerning the disposition of his complaint.

4. *Howard Schwartz.* On May 23, 1970, shortly after midnight, a black male teenager snatched a set of car keys from a woman who had just parked her car near Rodney Street and Mt. Airy Avenue. The boy and three companions

then fled the scene. Two police officers observed this incident and gave chase, but the boys escaped. Thereupon, the two officers, together with other officers who had been called to the scene, proceeded through the area and picked up approximately eight teenage boys and brought them back to the scene for possible identification by the victim. She did not identify any of the boys, and only one of the boys was believed by the police to resemble the youth they had earlier seen fleeing.

When one of the boys resisted the officers' efforts to have him confront the victim, Officer Duross pulled him from the police car and struck him in the face with his fist. All of the eight boys were taken away from the scene in police cars. Notwithstanding the victim's inability to identify her assailants, the two boys who had been apprehended by Officer Duross were taken to 14th District Headquarters. They were held until 8:30 a.m., when they were interviewed by a juvenile aid officer. They were charged with robbery, and subsequently released in the custody of their parents.

One Howard Schwartz, a disinterested witness who resided nearby, observed the police conducting the on-the-spot confrontations. He was disturbed by what he regarded as improper police conduct, and reported the incident to Mrs. Rouse of COPPAR. However, he made no complaint to police officials, because he felt it would be pointless.

5. *Kenneth Lassiter.* On June 6, 1970, at about 7 a.m., Kenneth Lassiter, a 16-year old black male, at the request of his mother, was loading some packages into a car in front of his home at 6th and Green Streets. He was dressed in a T-shirt, dungarees, and sneakers with no socks.

Detective McCaron was patrolling the area in an unmarked police car. Among other things, he was investigating a rape which had taken place at a nearby school the previous week. He had been furnished a description and a composite sketch of the alleged rapist. He concluded that Kenneth Lassiter resembled the suspect.

The officer approached Lassiter and ascertained his name, age and address, and told Lassiter that he was being taken into police custody for investigation in connection with some streetcar robberies.

Lassiter did not object to accompanying the officer. The officer made no attempt to inform the boy's family of the situation, until Lassiter's mother, who had observed the incident from inside the house, came out to protest.

The officer told her that Kenneth was being taken to the Central Detective Division, and he was in fact transported there in a patrol wagon.

Although the police apparently did not consider that Kenneth was under arrest, the fact is that he was photographed, shown the composite sketch of the rapist and told the reason for the investigation, warned of his right to remain silent and to have a lawyer, and questioned about his school and social activities. At some point, he was requested to take a lie detector test, and agreed to submit to this examination.

It is the policy of the Police Department, concurred in by the District Attorney's office, that any person 16 years of age or older may be submitted to a lie detector test, without notification to or consent of his parents, if he consents.

Kenneth was taken to the Police Administration Building, and a polygraph test was administered. As a result, the police concluded that Kenneth was innocent. One of the initial questions asked of Kenneth during the test was, "during the first 13 years of your life, do you remember jerking off?"

Kenneth was released at about noon on the day of his arrest. He had not been provided with any food during his time in custody, and he was not provided with transportation home.

Immediately after Kenneth was taken from his home by the police, his mother telephoned a relative who worked for the Human Relations Commission. The lat-

ter arrived at Central Detective Division while Kenneth was still there, but was not permitted to see him. She asked why he was being held, and was told that he was not under arrest, but was just "under investigation." She asked that, in that case, he be released immediately; and she was assured that Kenneth would be released in a few minutes. Instead, Kenneth was removed to the Police Administration Building for the polygraph test, but the relative was not informed of this until about 15 minutes later. She protested that he was too young for such a test, but her protests were ignored.

A written complaint in connection with this incident was made to the Police Commissioner. Staff inspectors interviewed Lieutenant McCaron, but no action was taken.

5. *Helen Peurifoy.* On June 10, 1970, the police were required to deal with what was apparently a potentially tense racial situation in Southwest Philadelphia (whether the tension was racial in origin, or stemmed from teenage gang disputes, is not altogether clear). Officers patrolling the area encountered a large group of persons, mostly blacks, in the vicinity of 57th Street and Chester Avenue. Some children in the group were holding bottles. The officers proceeded to arrest some of these persons.

Mrs. Helen Peurifoy, a black woman, had been visiting friends nearby and came out to see what was happening. She questioned the police as to why the particular people were being arrested, and urged the police to arrest some other persons who had escaped. She was immediately placed under arrest for "inciting to riot." She protested her arrest, and attempted to resist police efforts to handcuff her, by swinging her arms.

One Sergeant Simmons, Patrolman DiSalvatore, and two other police officers, subdued Mrs. Peurifoy and succeeded in placing handcuffs upon her. She was pulled across the street and pushed into a patrol wagon, and transported to the district police station.

Upon arrival at the police station, Mrs. Peurifoy did not willingly leave the patrol wagon, so she was yanked out of the vehicle by Officer DiSalvatore, who also threatened her with his nightstick and called her a "black bitch."

Inside the station, Mrs. Peurifoy requested a glass of water and some medication which she needed, but this request was ignored. She was not permitted to make a telephone call. After approximately 45 minutes, she was again handcuffed and taken in a patrol wagon to West Detective Division Headquarters.

During both of her trips in the patrol wagon, Mrs. Peurifoy was jostled extensively by the motion of the vehicle; she is convinced to this day that the vehicles were intentionally operated in an erratic manner, swerving from side to side, stopping and starting suddenly, in order to increase her discomfort.

At West Detective Division Headquarters, Mr. Peurifoy was kept in a cell for about an hour, and again was denied water and medication. She was questioned by a detective as to what had happened, and was not warned of her rights until after she has responded to his questions. She complained to him of her illness and need for medication, and also about the treatment which had been accorded her by the police. The detective then left the interview room, and returned in about 15 minutes, informed Mrs. Peurifoy that she was being discharged, and offered her a glass of water and the requested medication. She was then visited by a staff inspector who offered to drop all charges against her if she would promise not to file a complaint against the police officers. She was returned to the district police station, where the officer in charge told her that he would write a note to the officer who had mistreated her. About three hours after her original arrest, Mrs. Peurifoy was released, and no charges were ever filed against her.

6. *Mary Blackwell.* On July 23, 1970, at about 10 p.m., police were summoned to the scene of a disturbance in the area of 24th and Moore Streets, where bottles and stones were being thrown. There had been large-scale racial disturbances in that area in the past.

Among the other events of that evening, two police officers arriving at the 1700 block of 24th Street observed two teenage boys, one white and one black, confronting each other in the street, each with a belt wrapped around his hand. A crowd had gathered, and the officers had difficulty reaching the boys. One of the officers, Sergeant Mangini, took the belt away from the white boy, and approached the black youth, one Vincent Blackwell, 17 years of age. As Blackwell backed away from the officer, Sergeant Mangini struck him on the arm with his nightstick. Blackwell's 20-year-old sister attempted to intervene, and was jabbed in the abdomen with the nightstick.

Blackwell's mother, who had come down from her porch to try to get her boy back into the house, was nearby when this occurred. When the sergeant swung at her son, she grasped the officer's shirt and tried to push him away. The officer struck her in the abdomen and pushed her away from him.

Other people gathered around, and the sergeant cleared the area by swinging his nightstick. All three Blackwells were placed under arrest and taken to a patrol wagon. No one else was arrested on that occasion.

Mrs. Blackwell was dressed in a slip and blouse, and her daughter, who had been preparing for bed, was wearing blue jeans and a pajama top. All three Blackwells were taken to South Detective Division Headquarters. The police did not inform Mrs. Blackwell of the nature of the charges against her or her children. She was told that she did not have to make any statement, however she did make a voluntary statement, and so did the children.

While the Blackwells were being held in custody, the police were proceeding to investigate the incident, by taking statements from residents in the area. All of the witnesses agreed that Sergeant Mangini had not been attacked, and Sergeant Mangini had advised the detectives that he had struck the Blackwells. All of these interviews were completed by 1:30 a.m.

After 1:30 a.m., the Blackwells were given food for the first time, and Mr. Blackwell, the husband and father, was permitted to visit them and give them clothing.

At about 3 o'clock a.m., the three Blackwells were transported to the Police Administration Building, where they were fingerprinted and photographed. At about 4:30 p.m. on July 24, they were arraigned, and were told for the first time that they were charged with assault and battery on a police officer, disorderly conduct, resisting arrest, and inciting to riot.

On July 31, 1970, the Blackwells appeared at a preliminary hearing. The presiding magistrate dismissed all charges, but emphatically told Mrs. Blackwell that if any charges arising out of the arrests were brought against police officers, she would be rearrested and prosecuted.

7. *Jean Thomas.* On August 11, 1970, at about 6:45 p.m., Officer Tullio Ioannucci was shutting off an open fire hydrant at 39th and Mt. Vernon Streets. Mrs. Jean Thomas, a black woman, suggested to him that it would do no good to close the hydrant, because people would simply open it again. The officer told her, in effect, not to bother him. The conversation became heated. The officer called Mrs. Thomas a nigger bitch, and she called him a pig. Residents in the area began to gather about.

The officer advised Mrs. Thomas that he was going to arrest her for disorderly conduct, and proceeded to his nearby police car to call for a patrol wagon. Mrs. Thomas went into her house.

Additional police officers and park guards arrived, in response to Officer Ioannucci's call. He then attempted to enter Mrs. Thomas' house, but the doorway was blocked by her 17-year old daughter Cheryl. Two other children, James Thomas, 14, and Brenda Thomas, 18, also were at the door and told the police to stay away. Cheryl Thomas refused to move out of the officer's way, and was arrested and placed in the patrol wagon. The other two children tried to prevent this, and were also arrested and placed in the patrol wagon. Two officers then entered the house and conducted a thorough search, from basement to attic, but did not find Mrs. Thomas. They then left and took the three children to 16th District Headquarters. They were interviewed by a juvenile aid officer, but refused to give information. Brenda was sent to West Detective Division headquarters to be treated as an adult offender; James and Cheryl were charged with disorderly conduct, resisting arrest, and assault and battery, and were taken to the Youth Study center and held overnight. The next morning they were released, and all charges were dropped.

A few days later, Brenda Thomas was released, having been found guilty of one of the offenses charged against her. Mrs. Thomas was never arrested or charged with any offense arising out of this incident.

8. *Dennis Holland.* On August 14, 1970, at about 2 p.m., a police officer observed Dennis Holland, a 25-year old black male, lying unconscious in a parking lot at 13th and Commerce Streets. He called for an emergency wagon, which transported Holland to Jefferson Hospital.

In the emergency room, Holland regained consciousness, but did not respond sensibly to questions asked of him, and proceeded to behave in a very erratic manner. He was thereupon placed under arrest and charged with disorderly conduct. Although police obtained his identification from his wallet,

no member of his family was notified. He was promptly sentenced to 30 days in jail, in default of a $30 fine, and was taken to the House of Correction. He continued to behave erratically, and was taken to the prison hospital.

Throughout this entire series of events, Holland, who was a diabetic, had been suffering from a diabetic reaction, and was clearly not responsible for his actions. It was not until the following day that his true condition became known, after which his relatives were contacted, and he was released from prison that night.

No charge of actual police misconduct could properly be based upon this incident. The police, the hospital staff, and the committing magistrate exhibited merely a regrettable lack of concern, and a willingness to jump to conclusions.

9. *Fernando WHITE.* On August 15, 1970, at about 11:30 p.m., two highway patrolman got out of their police car in Germantown in order to investigate a person they believed to resemble a rape suspect. A group of persons were standing nearby. Upon completion of their investigation, the officers got back into their vehicle. A black youth, Fernando White, age 16 or 17, approached the vehicle on the passenger side, asked the officer for his name and badge number, and then spit upon him. The officers then emerged from the police car, subdued and handcuffed White, after a brief struggle.

White was taken to 14th District Headquarters, and a group of citizens followed him to that office in order to protest his arrest. A police lieutenant spoke to this group, interviewed White, and decided to release him because he had no prior record, the incident was not serious, and White apologized to the officer. No charges were filed, and White was released at about 12:30 a.m.

10. *Adalberto Molinas.* (This incident did not involve anything approaching misconduct by the police, nor does it shed any light upon the issues in this litigation.)

11. *Raid on Black Panther Headquarters.* On Saturday, August 29, 1970, two police officers were shot, one of them fatally, while on duty at a police station. On August 30, 1970, two more policemen were shot and wounded when they stopped a stolen car.

The Police Department apparently suspected that members of the Black Panther Party may have been involved in these shootings. A convention, the Citizens Constitutional Convention, was scheduled to be held in Philadelphia on September 4, 1970; members of the Black Panther Party were expected to attend that meeting.

The police planned massive raids on premises believed to be occupied by the Black Panther organization; the raids were carried out at about 6 a.m. on August 31, 1970. Raids on premises at 3625 Wallace Street, 2935 Columbia Avenue, and 428 Queen Lane, were conducted simultaneously.

The raid on 3625 Wallace Street was conducted pursuant to a search warrant. Members of the press were alerted in advance, and press photographers were present at the scene.

Interpreting the evidence in the light most favorable to the police, it appears that approximately 20 police officers arrived at 3625 Wallace Street; that an inspector knocked on the door and announced that he had a warrant to serve; and that thereafter some gun shots were fired from inside the building. The police fired about five rounds into the building, then fired tear gas projectiles into the building. The occupants emerged, with their hands on their heads. Police spotlights illuminated the area. All of the occupants were lined up at gunpoint against a wall, and all except the one female present were required to disrobe completely. They were photographed in that condition, and the photographs received widespread newspaper publicity.

The searches of the other premises were very vigorous and thorough. It does not appear whether there were search warrants for the other properties (apparently, there was no search warrant for the Queen Lane property). The three buildings were totally ransacked by the police.

As a result of the three raids, approximately 16 persons were arrested and charged with assault with intent to kill, violations of the Uniform Firearms Act, and conspiracy. All were held without bail until 8 p.m., at which time bail was set in the amount of $100,000 each, by a Common Pleas judge who, at the intervention of Police Commissioner Rizzo (now Mayor Rizzo) went to the Police Administration Building for that purpose, superseding the regularly assigned magistrate. At the bail hearing, the judge refused to consider or apply the prescribed standards for fixing bail. On September 3, 1970, in the course of a hearing in this Court on plaintiffs' request for a preliminary injunction directed, *inter alia*, to the bail issue, the bail in each case was, with the consent of the District Attorney's office, reduced to $2,500.

In conjunction with these raids, Mr. Rizzo made various inflammatory outbursts, arguably racial in overtone, in the presence of newspaper reporters; these remarks were widely published in the local press.

12. *23rd and South Streets Incident.* On August 30, 1970, at 5:45 p.m., a bus containing approximately 45 teenage males and 12 adults, all of whom were black, stopped near 27th and South Streets to pick up several black youths who were being pursued by a large group of white youths. Several passengers got off the bus, and fights erupted between whites and blacks; some of the participants were armed with sticks and bottles. A crowd, about evenly divided between whites and blacks, congregated in the area.

There had been several racial confrontations in that area over a period of several weeks. Three police officers appeared on the scene and immediately attempted to disperse the crowd and to

separate the blacks from the whites. The bus departed, with some of its occupants still on board; the remaining youths ran in all directions.

A large group, containing approximately 50 persons, most of whom were black, proceeded east on South Street. One of the police officers was injured when he tripped over an exposed water pipe. Other police learned of this injury, and apparently were under the impression that the police officer had been assaulted (it is agreed that he was not).

At 23rd and South Streets, two police officers halted the group mentioned above, and stood them against a wall. Several patrol wagons and a bus load of policemen arrived at the scene, and some of the officers drew their guns. The persons halted were frisked, handcuffed and placed in patrol wagons. A few youths who failed to halt were apprehended and brought back to the scene.

Altogether, 29 persons were taken into custody. Two who had suffered injuries were taken to a hospital; the remaining 27 (10 juveniles and 17 adults) were taken to the 17th District Headquarters. One youth was returned to the scene in an attempt to identify white persons involved in the incident, but no such identification occurred.

After about an hour at the 17th District Headquarters, the arrestees were taken to the Police Administration Building, where all were photographed and fingerprinted, and held in a cell room.

Detectives proceeded to interview the arrestees, in groups of five. The first five interviews were completed at about 8 p.m., by which time the police had learned from other sources that the injured officer had not been assaulted, but had sustained his injury by tripping and falling. At about 8 p.m., a representative of the Human Relations Commission telephoned the Police Administration Building to inquire about the situation.

Nevertheless, the interviews continued. A record check was run on each of the arrestees, and statements were taken from each.

By 9 p. m., the police had determined that no charges would be brought against any of the persons arrested. But the interviews continued. Ultimately, at about 11:30 p. m., the arrestees were taken back to the 17th District, where a representative of the Human Relations Commission had arranged to have them picked up by relatives.

The police did not consider that any of these individuals was arrested on this occasion. The only information given to the arrestees was that they were being held in custody to get them off the street.

No whites were arrested or detained in connection with this incident. The procedures actually followed by the police were totally inconsistent with the explanation ultimately offered, namely, that the police were attempting to protect the blacks arrested.

While the evidence does not justify the conclusion that the police were unwilling to prosecute the whites involved in these skirmishes, (some attempt was made to identify possible white culprits), the fact remains that blacks were taken into custody "for investigation", whereas the whites were not.

13. *Wilfredo Rojas.* On August 31, 1970, at about 11:30 a. m., police Officers Oliver and Brooks received word that two men had been stripping automobiles, and had been seen running west on American Street; and that one of the men was wearing a blue shirt. The officers observed Wilfredo Rojas, an 18-year old Puerto Rican male, and a companion, walking along Dauphin Street near American. The two youths stopped to converse with two individuals seated in a parked Volkswagen automobile.

Because Rojas and his friend had blue shirts on, the officers stopped to question them. Thereafter, one of the officers concluded that a female seated in the Volkswagen bore some physical re-

semblance to a person whose photograph he had seen on an FBI wanted poster.

The officers radioed for instructions, and a supervisor appeared on the scene. He told them that the alleged car strippers had already been arrested, and that Rojas and his friend were not involved in that offense. Nevertheless, all four persons were taken into custody and transported to East Detective Headquarters. Police records were checked, and the police satisfied themselves that the girl was not the person wanted by the FBI.

One of the males was wearing the insignia of the Young Lords Party. The police questioned all of the males about their involvement with that organization, and about a homicide with which the police suspected that the Young Lords Party had some connection. No charges were filed against any of these persons; all were released that day.

14. *Stop and Frisk Incidents of September 1, 1970.* On September 1, 1970, at about 9:30 p. m., a group of 16 police officers stopped a group of approximately 30 black teenage boys in the area of 48th Street and Fairmount Avenue. Some of the officers drew their guns, and the boys were ordered to line up against a wall, where they were searched. Finding no weapons, the police released the boys. At no time did the police give any indication as to the reason for their actions.

After proceeding approximately one-half block farther along the street, the same boys were stopped again by a different group of policemen, and the same search procedure was repeated. This time, the boys were ordered to leave the scene in different directions.

On the same evening, two police officers stopped another group of 10 or 15 black boys walking along Waylusing Avenue near Lancaster Avenue. The boys were searched, and were allowed to leave the area in groups of four or five.

The area in which these incidents occurred is known to the police as one in which juvenile gang activity flourishes. However, the boys who were stopped were not in fact involved in gang activities at the time.

15. *Ronald Crampton.* On September 3, 1970, two police officers at the scene of a fire saw a car go through a red light, at what they considered to be a high speed. They gave chase in their police car. The operator of the pursued vehicle, Ronald Crampton, was not aware of the police presence, and did not immediately respond. Ultimately, he became aware of the police officers and stopped his car. The police shined a spotlight on him, drew their weapons and ordered him out of the car. After frisking him, and being satisfied that he was unarmed, they gave him a ticket for going through the traffic light and for a defective muffler.

Mr. Crampton is convinced that he was not guilty of any infraction. He demanded a hearing in Traffic Court, but was fined even though neither officer appeared at the hearing.

16. *Johnson and Simon.* On September 8, 1970, at about 10 p. m., two black high school students, John Stanley Johnson and Herbert Simon, were walking along Chew Avenue in Germantown, immediately in front of Johnson's residence. Johnson was swinging a closed umbrella.

Officers Winchester and Kochik drove past the boys in an unmarked police car, and heard Johnson make some comment which they could not decipher. The police turned around and returned to the scene. They demanded to know what Johnson had said, frisked both boys and asked for identification. The boys denied making any comment, and told the police that Johnson lived at the house in front of which they were standing. The boys did not give the police their names, but Johnson handed the police his wallet, which contained his identification.

The boys were placed in the police car and transported to 14th District Headquarters. However, before they left the scene, Johnson's grandmother came out of the house and inquired as to where

they were being taken. The police gave her no reply.

While the boys were at the district headquarters, Simon complained that the police were being too rough with another individual whom they had apprehended. A black police officer pushed Simon away, and, when Johnson attempted to see what was happening, he pushed Johnson away and struck him on the chin with his fist, stating that he did not like the boys' attitudes.

The boys were then locked in a cell. Johnson's mother arrived at the station, but was not permitted to talk to him. After about an hour, the boys, handcuffed together, were taken in a patrol wagon to another police station at 22nd Street and Hunting Park Avenue. The police did not inform Johnson's mother of his whereabouts until about an hour after the boys had left.

At the 22nd Street and Hunting Park Station, the boys were interrogated as to their previous police contacts, and their organizational affiliation. At about 1:30 a. m., Johnson's mother was permitted to see them for the first time. After warning the boys of their constitutional rights, the police formally charged Johnson with disorderly conduct and interfering with a police officer. No charges were lodged against Simon.

Mrs. Johnson was permitted to talk to the officer who had struck her son; the officer maintained that he had acted properly.

Both boys were released in the custody of Mrs. Johnson at about 4 a. m. on September 9, 1970. Later in the day, Johnson and his mother were interviewed by a juvenile court officer. Because they disputed the charge that Johnson had struck the policeman, the case was referred to juvenile court.

17. *Alaberti and Whelan Incident.* On the evening of September 17, 1970, a white male was severely beaten by several black males, in the vicinity of 22nd and Pierce Streets, a racially tense area. Several police cars arrived at the scene, and the victim was taken to a hospital.

Many residents of the area, all of whom were white, were congregating in the street, aroused by the incident. The police told them to disperse, but some of the residents refused to leave the scene and were vocal in their criticisms of the police handling the matter.

One of the residents, Mrs. Alaberti, was pushed against a police car and struck with a nightstick. A 17-year old white youth, James Whelan, protested the treatment she was receiving. Several other persons loudly criticized the police. All were arrested, and held in custody at the 17th District Station for about an hour and a half. All were then released without charges.

None of the persons arrested made any complaints about the conduct of the police, because they were told by a ward committeeman who was present that any such complaints might result in criminal charges being placed against them.

18. *Fred Brooks Incident.* Two police officers stopped a 22-year old black male who was walking near his home at about 2 o'clock a. m. He could not produce any verification of his identity, but one of the officers recognized him as a resident of the neighborhood. They made a note of his name and age, and, apparently, detained him briefly while they checked some nearby parked cars for possible signs of criminal activity.

Under the circumstances, I am satisfied that the police acted reasonably in all respects on this occasion.

19. *Locke and Perry.* On September 20, 1970, at about 8:30 a. m., Officer Dennis Kirby was visually inspecting the interior of an automobile parked in the 2500 block of Mascher Street (his explanation is that he believed the car might be stolen). However, (a) he had no information to that effect and made no attempt to learn whether it had been reported stolen; and (b) the age and physical condition of the vehicle would seem to have made it an unlikely candidate for theft.

As the officer was withdrawing from the automobile, he was struck by some

water thrown from a third floor window of the adjacent house. The officer testified that he saw Oliver Locke throw the water. Oliver Locke, who resided at the house, denies having thrown the water. For present purposes, I shall assume that Locke did in fact throw water on the police officer.

A heated verbal exchange followed, in the course of which Locke told the officer to stay away from the car (which was Locke's car) unless he had a warrant.

Officer Kirby radioed for assistance, and Lieutenant Smith and several other patrolmen and a patrol wagon arrived a few minutes later. Locke remained at the open third-floor window of his house, and made several derogatory remarks to the police, including calling them "pigs." The police told him to come down to the door, that he was under arrest, and that if he did not come to the door they would come in and get him. Locke again stated "fuck you, pigs." What followed can only be described as a rather complete loss of control on the part of the police.

The police broke open the door to the house, and three of them ran up the stairs. Locke's wife, five months pregnant and dressed only in a nightgown, was standing on the second-floor landing. Lieutenant Smith pushed her out of the way and ran up to the third floor, where he seized Oliver Locke and pulled him down the stairs. Officer Kirby struck Locke on the head with a blackjack, causing an open wound.

As Locke was being dragged down the stairs, Lieutenant Smith again pushed Mrs. Locke aside. She followed them down the stairs, screaming, and the officers pushed her away and struck her body with their nightsticks. She was dragged by the hair, and fell down several steps.

Mr. Locke, still struggling, was pushed into a patrol wagon. His wife followed, protesting; she called the officers "pigs" and attempted to strike one of them on the back with her fists. The officers called her a pig as well, and pushed her into a patrol wagon.

Mr. and Mrs. Locke were taken to East Detective Division Headquarters, and locked in cells. In the course of this proceeding, Mrs. Locke, by reason of her condition and scanty attire, was the target of rude and offensive remarks from some of the policemen present. Mr. and Mrs. Locke remained at East Detective Division Headquarters until that evening, when additional clothing was obtained for Mrs. Locke, and both were taken to a hospital. Mr. Locke received five stitches for his head wound, Mrs. Locke was found to have a bruised foot, but no other medical problems developed.

After receiving hospital treatment, Mr. and Mrs. Locke were taken to the Police Administration Building and charged with assault and battery on a police officer, disorderly conduct, resisting arrest, threats to do bodily harm, and breach of the peace. They were released on bail.

The house in which the Lockes resided was shared with another couple, Mr. and Mrs. William Perry. On September 23 and 24, police, armed with a search warrant, appeared at the house to search for drugs. The search was very thorough. The officers removed clothing from bureau drawers, and emptied sugar bowls and soap cartons in the course of the search. No drugs were found. The officers made no attempt to straighten up the disorder their search had caused.

On November 24, 1970, at 2 a. m., Mr. Perry was arrested in South Philadelphia and held in police custody until 11 p. m. The police informed him that he was being arrested for "conspiracy to commit terroristic vandalism," but no formal charges were ever filed against him.

20. *Thomas Lodico.* On September 24, 1970, shortly before 9 a. m., Thomas Lodico parked his car near Bartlett Junior High School at 11th and Christian Streets, and proceeded to distribute to students several copies of the "Plain Dealer," an underground newspaper.

Mr. Lodico was 23 years of age, white, and had long hair, a mustache and beard. Bartlett Junior High School is located in a predominately black neighborhood.

The newspaper which Lodico was distributing contained an article entitled "Fuck the Schools," and included a rather illegible cartoon which, arguably, depicts someone stabbing or otherwise assaulting a police officer. The text of the newspaper article included many words generally regarded as obscene.

Two police officers stopped Lodico and asked for a copy of the paper. Lodico gave them one. The officers expressed the view that the newspaper was "trash." The officers then summoned their supervisor, a sergeant, to the scene. The officers searched the back part of Lodico's car, where there was a pile of these newspapers.

A group of about 20 adults and children gathered at the scene. The adults complained about the paper which Lodico was distributing.

The officers thereupon handcuffed Lodico, placed him in the patrol wagon, and transported him to a district station. About 15 minutes later, he was taken to South Detective Division Headquarters, where he was photographed. Lodico requested a lawyer and stated that he did not wish to make any statement; nevertheless, he was questioned by various detectives about his associations with another underground newspaper. He was held in custody until about 12:30 p. m., when he was released. No charges were filed. He was not fed during his time in custody. During this same period, Lodico's automobile was taken by the police to the South Detective Division Headquarters, and was searched further.

21. *Joseph Sterling.* On September 24, 1970, at about 9:15 a. m., Joseph Sterling, who also worked for the Plain Dealer newspaper, drove his automobile slowly through the intersection of 11th and Christian Streets, and parked at an angle, whereupon he got out of his car and looked about in a confused manner.

Mr. Sterling was white, 20 years old, and had long hair, a mustache and a beard.

A police officer (Rouse), who had observed Sterling's activities, stopped him and asked if anything was wrong. He noticed that Sterling's eyes seemed bloodshot, and that copies of the Plain Dealer were in Sterling's automobile. Officer Rouse then took Sterling into custody, and transported him to the district station, where Sterling was told that he was under arrest for driving while under the influence of narcotics. He was taken to the Police Administration Building in a patrol wagon, was fingerprinted and photographed, and voluntarily took a balloon test.

Sterling was permitted to make a phone call. He told the officers that he did not wish to make any statement until he had consulted a lawyer. Nevertheless, several detectives engaged him in a discussion involving his views on police activities and on the Vietnam war. He was interrogated about his use of drugs. He was not fed during his time in custody. At about 1 p. m., he was brought before a magistrate and was discharged.

22. *Mark Soto and Jerry Serrano.* On September 25, 1970, at approximately 10 p. m., police officer Charles Smith was called to the scene of a fist fight at Howard and York Streets. Approaching the area, he radioed for assistance. As the officer approached the scene, two males who appeared to have been engaged in a fight with each other stopped fighting, walked down York Street toward Hope Street, and again confronted each other as if to renew the fight. Officer Smith followed, and restrained one of the men against a parked car.

At this point, two other males grabbed Smith's arms and struck him with their fists, and one attempted to grab his gun. All three civilians then ran away.

A 15-year old black male, Mark Soto, was standing behind the officer; Smith apparently believed that he had been involved in the assault. Using the butt of his gun, Officer Smith struck Soto.

Soto tried to run away, but Smith caught him and wrestled with him, striking Soto again with his weapon.

At this point, two other police officers arrived on the scene. One of them struck Soto on the head with his night stick, and Soto fell to the ground. Two officers then held Soto down. Soto continued to struggle and was kicked in the head by a police officer.

A crowd gathered. Some were shouting derogatory remarks, others merely pleaded with the officers to stop treating Soto so roughly. Bottles and bricks were thrown in the general vicinity.

Soto was taken in a patrol wagon to 26th District Headquarters, and was then taken to Episcopal Hospital where he received stitches for a head wound. He was then taken to 25th District Headquarters and held over night. During this period, various police called him a Panther and a "black nigger."

In the course of the foregoing incident, two other officers saw a Puerto Rican male throw a bottle in the direction of their police vehicle. The culprit disappeared down Waterloo Street. Shortly thereafter, the officers apprehended Jerry Serrano, a Puerto Rican male age 16, believing him to be the person who threw the bottle at them. Two other officers appeared to assist in the arrest. Serrano struggled to escape. The officers struck him approximately six times on his back and arms with nightsticks, and called him a "Spic."

Serrano was taken first to one police station then to another. Ultimately, he was charged with assault and battery and disorderly conduct. He was released to his father at 5 a. m. the following day. Serrano has consistently denied that he was guilty of any offense on the occasion in question.

A delegation headed by Mrs. Mary Rouse, of the COPPAR organization, went to the 26th District Headquarters to protest the treatment of Mark Soto. She asked to speak to the captain, but he was not present and the officer in charge refused to communicate with him. Mrs. Rouse then telephoned Lieutenant George Fencl, head of the Civil Disobedience Squad, and he and the district captain soon arrived. After speaking briefly with the protesting group, these officers then sent for a staff inspector. Arriving a short time later, the staff inspector met with representatives of the protesting group and recorded their complaints and promised a thorough investigation. However, neither the complainants nor the district captain ever heard anything further about the investigation.

23. *Ellis Steward.* On October 1, 1970, at about 3:30 p. m., Ellis Steward, a 52-year black man, was driving in his car and picked up three young individuals. Sergeant Komada, patroling in a police car, saw these persons get into Steward's car. One of them resembled a person known to Sergeant Komada as a narcotics user, and Sergeant Komada had been informed that a Negro male was selling narcotics in the area. Accordingly, Komada followed the Steward vehicle.

At Germantown Avenue, the three passengers got out of the car. Shortly thereafter, Mr. Steward stopped his car in response to Sergeant Komada's signals. Komada asked Mr. Steward for his vehicle registration, and advised him that the persons who had just been in his car were narcotics users. The first card Steward showed to Sergeant Komada was not his vehicle registration. Steward was ordered out of his car, and complied, and was frisked. This occurred in front of a factory from which workers were emerging at the change of shifts. Steward loudly objected to the police procedure, especially in front of a large number of people in an area where he was known. He informed the officer that he was physically disabled. Sergeant Komada then arrested Steward for disorderly conduct.

At that point a second officer (Flint) arrived on the scene, and the two policemen proceeded to handcuff Mr. Steward. Steward objected to being handcuffed and swung his arms about to evade the

handcuffs, whereupon Officer Flint struck Steward on the shoulder and head with his blackjack. Steward and both officers fell to the ground in the scuffle. Steward was handcuffed and placed in a patrol wagon. Upon arrival at the 35th District Headquarters, Steward seemed to be unable to walk. He lay on the floor for about a half hour, and then was taken to a hospital, where a physician examined him and concluded that he was all right. He was then returned to the police station and formally charged with disorderly conduct and resisting arrest. He was eventually released from custody at 3:30 a. m. the following morning. During his 12 hours in police custody, he was not fed. On October 21, 1970, he was convicted of the above charges in Philadelphia Municipal Court.

24. *Albert Boccuto and Anthony Dignetti.* On October 6, 1970, at about 6 p. m., a group of about 20 boys, ranging in age from 15 to 21, were playing football in a school yard at 3600 North Randolph Street. During the preceding two-year period, the police had received many complaints from residents of the area and from the Board of Education to the effect that the school building was being vandalized and that young persons were drinking and breaking bottles in the school yard at night.

Officer Wells, patrolling nearby, knew of these earlier complaints. He went to the school yard and told the boys to leave.

One of the youths, Albert Boccuto, age 17, Caucasian, did not immediately leave, and protested the validity of the officer's order. The officer radioed for assistance. Boccuto used obscene language to the officer, and the officer then told him that he was under arrest. The officer pushed Boccuto against a chain fence and held him by the hair to prevent his escape. Nearby residents gathered to witness the encounter.

Another white male, Anthony Dignetti, age 22, protested the officer's treatment of Boccuto. The officer told him

that he also was under arrest. Both youths were then handcuffed and taken in a patrol wagon to the 25th District Headquarters. Other officers arriving on the scene dispersed the remaining crowd by waving their nightsticks.

Neither Boccuto nor Dignetti was told by the arresting officer why they were supposed to leave the school yard, nor why they were arrested. Boccuto was charged by juvenile officers with disorderly conduct and resisting arrest. He was held in a cell for several hours and then released. The charges were dismissed the next day. Dignetti was charged with disorderly conduct. He was held for three hours and then released; the charges were dismissed the next day.

Dignetti testified that, while being held at the police district headquarters, he was punched several times by a guard. The guard flatly denied any such incident. In the absence of any clear basis for assessing the relative credibility of these witnesses, I have concluded that the evidence on this point is evenly balanced, and therefore make no finding that Dignetti was beaten.

About a month before the above incident, on September 4, 1970, at about 9 p. m., Albert Boccuto and a companion, Sammy Fabrizzo, were stopped by two police officers in the vicinity of 5th and Annsbury Streets. The officers held the boys at gunpoint, frisked them, asked them where they were going and what they were doing, and then permitted the boys to leave. It appears that the police had received numerous complaints from residents in the area, concerning groups of teenagers congregating on street corners and causing disturbances. The police response to these complaints was to disperse any crowds they saw on street corners, and to arrest anyone who failed to comply, on charges of "corner lounging" or disorderly conduct.

25. *Dwight Redding Byrd.* On October 12, 1970, at 1:15 p. m., Officers Winchester and Byrne observed one Dwight Redding Byrd, a Negro male,

holding in his hand a 20-inch sword, partially removed from its wooden sheath. Several other Negro males, one of whom had a large stick in his hand, were walking away from Byrd.

Winchester approached Byrd, took the sword away from him, examined it, and advised Byrd that he was under arrest. He then attempted to place handcuffs on Byrd. Byrd pulled away, and the sword fell to the ground. In the meantime, Officer Byrne had stopped the other Negro males, and, with gun drawn, required them to lean against a wall, frisked them, and asked their identification.

As Byrd continued to struggle with Officer Winchester, flailing his arms and kicking, the unsheathed sword lay on the pavement about four feet away. Officer Byrne came to his fellow officer's assistance; neither officer picked up the sword.

After about a minute, Byrd picked up the sword and began to swing it over his head. The officers were standing in the street about five feet away from Byrd, backing away from him. Both officers drew their guns.

Byrd was speaking in a foreign tongue (possibly Arabic). He faced the officers, swinging the sword in front of his face. He stepped toward the officers, but did not point the sword at them or lunge at them.

The officers told Byrd to drop the sword. They repeated this instruction three or four times. When he failed to comply after about 30 seconds, Officer Byrne fired into Byrd's chest, and Winchester fired into Byrd's leg. Byrd fell to the sidewalk; 20 minutes later he was removed from the scene; he was pronounced dead on arrival at the hospital.

The District Attorney later ruled that the killing of Dwight Byrd was justifiable homicide.

26. *Mr. and Mrs. Leon Brown, and Edward Smalley.* On October 18, 1970, a Sunday, at about 2:30 p. m., four police officers assigned to the narcotics unit acted unreasonably in conducting a search of the residence of Mr. and Mrs. Leon Brown, 3943 North 10th Street, pursuant to a search warrant.

For present purposes, I shall assume, without deciding, that the search warrant was valid. The four officers, none of whom was in uniform, all of whom were casually dressed, knocked on the door, displayed their badges to Mrs. Brown's sister, who was looking out through the door window, and demanded entry. Without waiting for a response, they broke down the door, breaking it off its hinges. They then thoroughly ransacked the entire house.

Three officers invaded Mrs. Brown's bedroom on the second floor; she had just arisen from a nap, and was clad only in her underwear. She was ordered to remain standing as the officers searched the bedroom. After some delay, she eventually was provided with a housecoat.

The officers emptied out drawers and closets in all of the rooms in the house, and overturned mattresses. They did not inform Mr. and Mrs. Brown the purpose of the search, until it had been in progress for several minutes. They then advised the Browns that they were looking for drugs, and checked the Browns' arms for signs of needle marks.

The police found no drugs, and left the premises after about a half hour. Before leaving, they put back some of the items which they had dumped from bureau drawers, but the premises were in considerable disorder after the police left. The front door was not repaired.

At about the same time that the above search was taking place, a similar search was conducted at 2619 West Lehigh Avenue, in which an Afro boutique shop occupied by a friend of the Browns, one Leonard Smalley, was located. Although the affidavit in support of the alleged search warrant indicated that the warrant was directed at the boutique shop, the officers searched the second and third floors of the building first, before proceeding to search the boutique shop.

No one was present in the building when the police arrived. They broke the lock on the building door, searched upstairs, then broke the door to the boutique shop off its hinges and searched the shop.

No drugs were found, the merchandise was disarranged, and some items were stolen. The entire search took about a half hour.

Mr. Smalley learned of the search of his shop when, on behalf of the Browns, he inquired at the 22nd and Hunting Park Avenue Station as to the purpose of the search of the Brown residence. After observing the damage to his store, he returned to the police station on two or three occasions and asked to see the search warrant. No such warrant has ever been shown to him.

27. *Mrs. Irene Thompson.* On October 23, 1970, at about 4 p. m., an 11-year old Negro boy was caught shoplifting at a Woolworth Store on Chester Avenue. When he refused to give his name and address, the manager called the police.

Officer Leon Burke responded to the call. Holding the boy by his belt, he escorted him to the sidewalk. The boy then attempted to escape, and bit the officer on the finger. The officer lost his temper. He wrestled the boy to the sidewalk, fell on top of him, and repeatedly banged his head against the pavement. A crowd gathered, and complained of the officer's treatment of the boy.

Mrs. Irene Thompson, a black woman, reasonably well educated and responsible, observed the officer's conduct. She had not known any of the persons involved previously. She was very disturbed at the incident, and made several attempts to complain about Officer Burke's conduct, and to inquire about what had happened to the boy.

The police were reluctant to listen to her; she was not permitted to talk to Officer Burke, even though he was present in the station house.

When Mrs. Thompson insisted that she wished to make a complaint, it was finally arranged that one of the police officers would listen to her. However, as she was explaining the incident to him, he kept defending the conduct of Officer Burke. Mrs. Thompson was told to return to the police station the following Monday. She did so, but was told that no one knew anything about the matter.

Mrs. Thompson has never received any information from any police or city source concerning her complaint, or concerning the boy who had been mistreated.

### H. *Statistics*

At the request of the Court, certain statistical information has been furnished by the defendants. The period covered by these statistics runs from January 1, 1968 to July 1, 1970. During that period, 2,339 persons were arrested and charged with assault and battery on a police officer or resisting arrest. In 1,451 of these cases (62 percent), either no other charges were filed, or the other charges were limited to such crimes as disorderly conduct, breach of the peace, interfering with an officer, intoxication, or incitement to riot.

During the same period, 2,709 cases which included charges of resisting arrest or assault and battery on a police officer were disposed of. Seventy-eight percent of the defendants were exonerated (67 percent before trial). Only 26 percent of these cases resulted in convictions for disorderly conduct, breach of the peace, threats, or intoxication.

By way of comparison, there were a total of 97,688 arrests in 1968, of which 17,960 were for serious offenses; there were 99,932 arrests in 1969, of which 18,103 were for serious offenses; and there were 101,552 arrests in 1970, of which 20,769 were for serious offenses. The term "serious offenses", as used in the foregoing statistics, means murder, rape, robbery, aggravated assault and battery, burglary, larceny of automobile, and larceny involving goods valued at more than $50.

The COPPAR organization received approximately 200 complaints of police misconduct during the first eight months of 1970.[1]

## II. DISCUSSION

Careful evaluation of all of this mass of evidence leads inescapably, and perhaps not surprisingly, to the conclusion that, while the overall situation is not as bad as the plaintiffs contend, neither is it as acceptable as the defendants contend.

At the outset, it may be appropriate to register a few general observations about the difficult problems of the police in our society, and the practical limitations upon the role of courts in resolving disputes of the kind represented by this litigation. It is a truism that the multitude of social ills afflicting our society bear most heavily upon the poor, and especially upon the black poor. These same social ills spawn much of the activity which society regards as criminal. Society as a whole, in the ghettos as well as in the suburbs, looks to the police for protection against criminal activity. The policeman is not responsible for the deplorable conditions in which the underprivileged exist, but he is charged with responsibility for dealing at firsthand with the more egregious results of these conditions. To the deprived, he can easily become the symbol of society's oppression, and the target for undifferentiated hostility generated by causes having no direct relationship to police conduct.

Police traditionally are trained and function as a quasi-military organization. Generally speaking, they are required to enforce the law as it is written. They are required to obey orders, and to exact obedience from others. The tactics of police enforcement involve a considerable measure of naked power. Dealing so frequently with persons who have no respect for law or for the police function, the policeman cannot always rely upon peaceful and reasonable persuasion as the instrument of choice.

The hazards of police work are very real and pervasive. The conduct of individual officers in stress-filled situations should not be judged by the standards of armchair hindsight.

And finally, departmental routine in a large police department is necessarily somewhat cumbersome and time-consuming. The record is replete with instances of this problem. Typically, an individual is stopped by a patrolling police officer and questioned briefly about some actual or suspected misfeasance. If he does not give a satisfactory account of himself, he is taken to the precinct office. After some delay and processing there, if further questioning is desired, he is transported to the Detective Division for interrogation and further processing. Thereafter, he is transported to the Police Administration Building in center-city ("The Roundhouse") for further questioning and, perhaps, detention, formal charges, and a preliminary hearing. Where there was probable cause for the original arrest, the entire process would seem to be unobjectionable. But the record makes clear that this practice is not limited to probable cause situations.

From the record as a whole, it is impossible to avoid the conclusion that, in the absence of probable cause for arrest, at least two classes of individuals are particularly likely to be subjected to this kind of procedure: poor blacks, and individuals who question or protest the initial police contact. It is apparent from this record that a substantial number of policemen genuinely believe (a) that if an individual is freed without formal charges within 24 to 48 hours after his initial arrest, he should not object to the inconvenience involved; (b) that a per-

---

1. At a post-hearing conference in January 1973, both sides were afforded an opportunity to reopen the hearings in order to produce evidence of any pertinent changes in procedures, or, other relevant circumstances, which may have occurred since the briefs were filed. In the absence of any request for reopening, the cases are being disposed of on the existing record.

son who questions the propriety of police conduct, or refuses to cooperate with the police, should expect to be inconvenienced, or worse; and (c) that if it is ultimately established that there was probable reason to believe an individual guilty of an offense, his treatment at the hands of the police should be judged by different standards than those applicable to the innocent. And, needless to say, such incidents are viewed by the police and the detainees from entirely different perspectives; a course of events which, to the policeman, are merely routine "police procedure" often appear to the civilian involved to be drastic and outrageous encroachments upon his liberty and privacy.

Problems similar to those presented in this case have been the subject of a great deal of learned commentary. *See,* for example, Skolnick: Justice without Trial, Law Enforcement in a Democratic Society (1966); Westley: Violence and the Police: A Sociological Study of Law, Custom, and Morality (1970); Chevigny: Police Power, Police Abuses in New York City (1969); Niederhoffer: Behind the Shield, the Police in Urban Society (1967). Two presidential commissions have addressed themselves extensively to these issues: The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police (1967), at pp. 178–207 (in which, incidentally, the Philadelphia Highway Patrol is described as a "skull-cracking division"); Report of the National Advisory Commission on Civil Disorders, Ch. 11 (1968). A review of this material suggests that the problems disclosed by the record in the present case are not new, and are fairly typical of the problems afflicting police departments in major urban areas.

■ The totality of the evidence in this case convincingly establishes the following general conclusions:

1. Violations of the legal and constitutional rights of citizens are committed by only a small percentage of the members of the police force.

2. Nevertheless, such violations do occur, entirely too frequently.

3. The evidence does not disclose any conscious departmental policy of racial bias, or of discriminatory enforcement on racial lines.

4. The presence of racial prejudice on the part of an individual police officer, manifested in the performance of his police duties, is unlikely to be reflected adversely in the performance ratings accorded him by his superiors.

5. Existing procedures for handling civilian complaints and for enforcement of police discipline related to civilian complaints is totally inadequate. It is the policy of the department to discourage the filing of such complaints, to avoid or minimize the consequences of proven police misconduct, and to resist disclosure of the final disposition of such complaints.

The evidence discloses that violations of legal and constitutional rights of citizens by the police are most widespread in the following areas of police activity:

(1) Arrests "for investigation"; (2) Treatment of citizens who question or criticize what the police are doing in a particular instance; (3) Charges of resisting arrest, when the arrest was unlawful in the first place; (4) Extreme overreaction to actual or reported assaults upon policemen.

Before discussing the ultimate issue as to whether or not the plaintiffs are entitled to relief in this proceeding, various legal issues must be resolved.

■ The defendants filed motions to dismiss in both cases, pursuant to Federal Rule of Civil Procedure 41(b), apparently on the theory that the Court lacks the power to grant injunctive relief in situations of this kind. However, when a pattern of frequent police violations of rights is shown, the law is clear that injunctive relief may be granted. Lewis et al. v. Kugler et al., 446 F.2d 1343 (3d Cir. 1971).

■■ Defendants in the *Goode* case also seek dismissal on the ground that indispensable parties (Officers De Fazio

and D'Amico) were not joined. I agree that, in the absence of these individuals as parties to the lawsuit, no relief which directly affects them may properly be granted. However, the evidence concerning these two officers is relevant, and may properly be considered, in connection with the issues involving the remaining defendants.

In the *COPPAR* case, the defendants moved to dismiss the complaint on the ground that it was too vague and general to state a cause of action under § 1983. While the complaint is probably insufficient on that ground, *see* Negrich v. Hohn, 379 F.2d 213 (3d Cir. 1967), this defect was remedied by requiring the plaintiffs to provide a list of witnesses and a brief description of each incident charged, in advance of the hearings in this case.

■ The District Attorney has moved to dismiss the complaint in the *COPPAR* case. To the extent that some of the plaintiffs originally sought injunctions against pending criminal prosecutions, the motion clearly is meritorious. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 747, 27 L.Ed.2d 669 (1972). However, this Court, early in the proceedings, declined to grant such relief, and the plaintiffs in question appeared to have abandoned this issue. In view of the District Attorney's relationship to the handling of civilian complaints against police misconduct, he was properly retained as a party to the litigation.

■ At an earlier stage of the proceedings, I informally granted the defense motion to dismiss the case with respect to the Black Panther Party and the Young Lords Party, because of their refusal to submit to discovery. That ruling will now be formalized. Elimination of these organizations as parties plaintiff does not, of course, preclude consideration of the evidence relating to these organizations or their members in connection with the issues raised by the other plaintiffs.

■ Defendants in the *COPPAR* case have also argued that COPPAR has no standing to bring this action, and is not a proper representative of the class of plaintiffs. I believe COPPAR does have the requisite standing. *See* N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Smith v. Board of Education of Morrilton School District, 365 F.2d 770 (8th Cir. 1966).

On September 4, 1970, I entered an injunction in the *COPPAR* case, restraining the police from violating the constitutional rights of citizens in certain enumerated respects. The Ellis Steward incident and the Johnson and Simon incident occurred while this injunction was in effect, and plaintiffs seek an adjudication of contempt. While it appears that the order of this Court was violated, particularly in the Johnson and Simon case, this may have been due to a lack of precision in the framing of the injunctive order. Although it is a close question, I am not persuaded that the violation was willful. The police apparently were not aware that what they did amounted to an arrest.

In both cases, the captions should be amended to designate Mr. Rizzo as the Mayor, and Mr. Thomas O'Neill as the Police Commissioner, and to reflect such other personnel changes as have occurred in the interim.

As noted earlier, the evidence in this case does not establish the existence of any overall Police Department policy to violate the legal and constitutional rights of citizens, nor to discriminate on the basis of race. The record does establish, however, that such violations do occur, with such frequency that they cannot be dismissed as rare, isolated instances; and that little or nothing is done by the city authorities to punish such infractions, or to prevent their recurrence. I am convinced that, except in cases of severe injuries, existing remedies are inadequate to protect the public interest involved. Private suits for damages are expensive, time-consuming, not readily available, and not notably successful; moreover, they have no preventive effect. Except in extreme cases,

criminal prosecutions are unlikely; and, in any event, given the dual role of the District Attorney's staff, such prosecutions are a most unsatisfactory vehicle for vindication of the rights involved.

Respect and admiration for the performance of the vast majority of police officers cannot justify refusal to confront the reality of the abuses which do exist. But deference to the essential role of the police in our society does mandate that intrusion by the courts into this sensitive area should be limited, and should be directed toward insuring that the police themselves are encouraged to remedy the situation.

■ In the course of these proceedings, much of the argument has been directed toward the proposition that courts should not attempt to supervise the functioning of the police department. Although, contrary to the defendants' assertions, the Court's legal power to do just that is firmly established, *see* for example, Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1938); Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966); Belknap v. Leary, 427 F.2d 496 (2d Cir. 1970); Lewis et al. v. Kugler et al., *supra. And see* The Federal Injunction as a Remedy for Unconstitutional Police Conduct, 78 Yale L.J. 143 (1968); and *cf.* Holt v. Sarver, 442 F.2d 304 (8th Cir. 1971) (prison conditions), I am not persuaded that any such drastic remedy is called for, at least initially, in the present cases.

To a large extent, consideration of sweeping injunctive relief in the present cases has been obviated by the consent injunctive decree in the Alexander v. Rizzo case (C.A. No. 70–992). Although the point has not been raised by the parties, it would seem that this decree should be accorded *res judicata*, or at least collateral estoppel, effect, at least with respect to the abuses inherent in initial police contacts and arrests "for investigation." In any event, the entry of that decree should go far to eliminate many of the abuses complained of in the present cases.

While there are additional areas of police misconduct asserted in the present

case, to which a further injunctive decree might by directed, I am satisfied that the establishment of adequate procedures for handling and adjudicating civilian complaints against the police would go far to prevent further abuses, and to reduce the friction which the existing procedures, or lack of procedures, generate.

There are four principal defects in the present arrangement. (1) The departmental procedures are geared to handle infractions of police rules and regulations, yet these rules and regulations are not framed to cover specific violations of the legal and constitutional rights of civilians; (2) Complaints are handled on a "chain of command" basis, and this results in a tendency to minimize and discourage civilian complaints; (3) The existing procedures do not provide adequate opportunity for the civilian complainant to present his case, before a relatively objective tribunal; and (4) The outcome of the proceeding is not disclosed.

■ ■ In attempting to frame an appropriate remedy in this litigation, the existence of sharp philosophical differences over the issue of civilian review of police activities cannot be overlooked. The defendants, and police generally, strongly oppose the entire concept of civilian review. Plaintiffs, on the other hand, appear to contend that no other solution is feasible. It is not the function of a court to attempt to resolve this doctrinal controversy; such issues are best resolved in the legislative and executive branches of government, and ultimately in the polling places. But it is the obligation of a federal court, under the Civil Rights Act, to take appropriate action to prevent recurring and otherwise predictable violations of the constitutional rights of citizens. If this can be accomplished without imposing some form of civilian review, that course of action seems preferable, since it would represent the least drastic of possible alternatives. But if, after a reasonable opportunity for experimentation, the police themselves prove unable to reduce the abuses complained of to an accepta-

ble minimum, then some form of civilian intervention, whether by a civilian administrative agency, or by injunctive decree, may become necessary.

In conformity with the views expressed above, the defendants will be required to formulate and submit to this Court for approval, a comprehensive program for dealing adequately with civilian complaints alleging police misconduct. It is suggested that the following guidelines should be carefully considered in such formulation: (1) Appropriate revision of police manuals and rules of procedure spelling out in some detail, in simple language, the "dos and don'ts" of permissible conduct in dealing with civilians (for example, manifestations of racial bias, derogatory remarks, offensive language, etc.; unnecessary damage to property and other unreasonable conduct in executing search warrants; limitations on pursuit of persons charged only with summary offenses; recording and processing civilian complaints, etc.). (2) Revision of procedures for processing complaints against police, including (a) ready availability of forms for use by civilians in lodging complaints against police officers; (b) a screening procedure for eliminating frivolous complaints; (c) prompt and adequate investigation of complaints; (d) adjudication of non-frivolous complaints by an impartial individual or body, insulated so far as practicable from chain of command pressures, with a fair opportunity afforded the complainant to present his complaint, and to the police officer to present his defense; and (3) prompt notification to the concerned parties, informing them of the outcome.

In this connection, I note that the plaintiffs have contended that, so long as the final decision is reviewable by the Police Commissioner, any such procedure is likely to prove inadequate. I am not persuaded that this necessarily follows. Some worthwhile analogies may perhaps be derived from the recent improvements in handling disciplinary matters in the military forces. It has apparently been feasible in the Armed Forces to provide relatively impartial adjudications, essentially unfettered by command pressures, while still retaining control by the military. If, in notifying the complainant as to the disposition of his complaint, a brief statement of the reasons for the disposition were also required, arbitrary or erroneous rejection of legitimate complaints would be unlikely.

It should be mentioned that the foregoing guidelines are consistent with generally recognized minimal standards for improving police-community relations. They impose no substantial burdens on the Police Department, and pose no threat to vigorous law enforcement. They afford protection to the accused policeman, as well as to the complaining civilian.

In conclusion, it should perhaps be emphasized that this Court has not decided that the plaintiffs and the class they represent have a constitutional right to improved departmental procedures for handling civilian complaints against police. What the Court has decided is that, under existing circumstances, violations of constitutional rights by police do occur in an unacceptably high number of instances; that, in the absence of change in procedures, such violations are likely to continue to occur; and that revision of procedures for handling civilian complaints is a necessary first step in attempting to prevent future abuses.

An appropriate order will be entered in each of the two cases.

## ORDER IN NO. 72–2430

And now, this 14th day of March, 1973, it is ordered:

1. The Black Panther Party and the Young Lords Party are stricken from the caption of the case as plaintiffs, and as to those plaintiffs the complaint is dismissed.

2. The remaining plaintiffs are directed to make appropriate amendments to the caption of the case, to reflect changes in personnel which have occurred during the pendency of this lawsuit.

3. The defendants, acting jointly or separately, as they may prefer, are directed, within thirty (30) days from the date of this Order, to submit to this Court for its approval a comprehensive program for improving the handling of citizen complaints alleging police misconduct, in conformity with the views expressed in the Opinion of this Court filed this date.

ORDER IN NO. 7–491

And now, this 14th day of March, 1973, it is ordered:

1. The plaintiffs are directed to make appropriate amendments to the caption of the case, to reflect changes in personnel which have occurred during the pendency of this lawsuit.

2. The defendants, acting jointly or separately, as they may prefer, are directed, within thirty (30) days from the date of this Order, to submit to this Court for its approval a comprehensive program for improving the handling of citizen complaints alleging police misconduct, in conformity with the views expressed in the Opinion of this Court filed this date.